DOOLIN SECURITY SAVINGS
BANK, F.S.B., Petitioner

v.

OFFICE OF THRIFT SUPERVISION and
Nicolas P. Retsinas, Director, Office of
Thrift Supervision, Respondents

No. 97–1222.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 9, 1997.

Decided March 27, 1998.

John C. Deal argued the cause and filed the briefs for petitioner.

Aaron B. Kahn, Principal Litigation Counsel, Office of Thrift Supervision, argued the cause for respondents. With him on the brief were Thomas J. Segal, Deputy Chief Counsel, Elizabeth R. Moore, Assistant Chief Counsel, and Jacqueline H. Fine, Trial Attorney.

Irene M. Solet, Attorney, U.S. Department of Justice, argued the cause for amicus curiae United States. With her on the brief were Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, Acting U.S. Attorney at the time the brief was filed, Stephen W. Preston, Deputy Assistant Attorney General, U.S. Department of Justice, Douglas N. Letter, Litigation Counsel, and H. Thomas Byron, III, Attorney.

Theodore B. Olson, Paul Blankenstein, Mark A. Perry, John K. Villa, Mary G. Clark, Bettina M. Lawton, Frank J. Eisenhart, and Arthur W. Leibold, Jr., were on the brief for amici curiae Maxxam, Inc., et al. Richard P. Keeton entered an appearance.

Before: HENDERSON, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Article II of the Constitution allows the President to appoint Officers of the United States by and with the consent of the Senate. The President may also make temporary appointments of Officers without Senate confirmation for "Vacancies that may happen during the Recess of the Senate." What if an appointee resigns or dies while the Senate is in session? Must the office remain unoccupied unless the President nominates, and the Senate confirms, someone else? For more than two centuries, legislation has given an answer. In its modern version, the Vacancies Act, 5 U.S.C. §§ 3345–3349, authorizes the Executive to fill positions temporarily when a vacancy occurs as a result of an officer's resignation, death, illness or absence. A dispute about the meaning of the Vacancies Act is at the center of this case.

The dispute arose after an agency's "acting" director initiated administrative enforcement proceedings and then resigned before taking final agency action. The President invoked the Vacancies Act to name his replacement. This individual issued the final agency order now before us on judicial review. Neither the acting director nor the individual named by the President had been nominated and confirmed for the position of agency director. According to petitioner, the President's authority under the Vacancies Act had already expired when he invoked the Act, both individuals illegally occupied the office of agency director, and the orders they signed are therefore null and void.

I

In September 1993, on behalf of the Office of Thrift Supervision, "Acting Director" Jon-athan L. Fiechter signed a "Notice of Charges and Hearing for Issuance of Cease and Desist Order Directing Affirmative Action," thus beginning an administrative enforcement action against petitioner Doolin Security Savings Bank. See 12 U.S.C. §§ 1464(d)(1)(A) & 1818(b). The usual thrusts and parries of litigation then ensued: subpoenas issued and motions to quash came back; extensions of time were sought and opposed; motions and memoranda were exchanged; depositions taken and objections noted; documents produced and withheld. Counsel for the Bank and counsel for OTS took their differences to an administrative law judge. After a year of this, a hearing began in Wheeling, West Virginia, with the ALJ presiding.

In April 1996, two and a half years after Acting Director Fiechter issued the Notice of Charges, the ALJ handed down his "Recommended Decision." The ALJ found that the Bank had violated the law and had engaged in unsafe and unsound banking practices. The ALJ's exhaustive findings of fact and conclusions of law ended with a proposed order for the "Acting Director," a position Fiechter was still occupying. The Bank and counsel for OTS filed exceptions. Before passing on the ALJ's recommendation, Fiechter resigned. A new Director, Nicolas P. Retsinas, extended the time for a final decision, reviewed the ALJ's proposal and the parties' exceptions, and issued a final written opinion and a cease and desist order against the Bank in March 1997. That order is the subject of the Bank's petition for judicial review.

Created in 1989, OTS is the principal oversight agency responsible for monitoring the financial health of thrift institutions. OTS is part of the Department of the Treasury, see 12 U.S.C. § 1462a(a), but the Secretary of the Treasury is barred from intervening in matters before the agency. See 12 U.S.C. § 1462a(b)(3) & (4). Congress placed OTS's broad oversight authority entirely in the hands of its Director. The Office of the Director is the only named position in OTS's governing statute, and it is the Director who is responsible for hiring staff and overseeing

the regulation of savings associations. *See* 12 U.S.C. § 1462a(a)-(e) & (h); 12 C.F.R. § 500.10.

█ Because the OTS Director exercises "significant authority pursuant to the laws of the United States," the occupant of the position undoubtedly qualifies as an "Officer" under the Constitution, and is thereby subject to the Appointments Clause, Article II, § 2, cl. 2, of the Constitution. *Buckley v. Valeo*, 424 U.S. 1, 126, 96 S.Ct. 612, 685–86, 46 L.Ed.2d 659, (1976); *Edmond v. United States*, 520 U.S. 651, ——, 117 S.Ct. 1573, 1580, 137 L.Ed.2d 917 (1997). Congress did not vest the Director's appointment in the President or the Treasury Secretary. Instead the governing statute provides that the Director must "be appointed by the President, by and with the advice and consent of the Senate." 12 U.S.C. § 1462a(c)(1). "The Director shall be appointed for a term of 5 years," 12 U.S.C. § 1462a(c)(2), but an incumbent may hold over "after the expiration of the term for which appointed until a successor Director has been appointed." 12 U.S.C. § 1462a(c)(4).

Despite the Appointments Clause, the statute governing OTS, and the significant regulatory responsibility lodged in OTS, the agency has a history of being run by individuals who were neither nominated by the President nor confirmed by the Senate for the position of OTS Director.

OTS's first Director, M. Danny Wall, served from August 9, 1989, until he resigned on March 5, 1990. Wall had originally been appointed Chairman of the Federal Home Loan Bank Board, but was never nominated for the position of OTS Director. Two district courts held that his occupation of the office of OTS Director violated the Appointments Clause. *See Olympic Fed. Sav. & Loan Ass'n v. Director, OTS*, 732 F.Supp. 1183, 1193 (D.D.C.), *dismissed as moot*, 903 F.2d 837 (D.C.Cir.1990); *Franklin Sav. Ass'n v. Director, OTS*, 740 F.Supp. 1535, 1541 (D.Kan.1990), *rev'd on other grounds*, 934 F.2d 1127 (10th Cir.1991).

After Wall's departure, President Bush designated Salvatore R. Martoche to serve as acting Director of OTS, effective March 6, 1990. The legality of Martoche's occupation of the office was also called into question. *See Olympic*, 732 F.Supp. at 1199.

President Bush next nominated, and the Senate confirmed, Timothy Ryan to be OTS Director, effective April 4, 1990. Ryan served until December 4, 1992, when he resigned.

On his last day in office Ryan purported to delegate all his authority as Director to Jonathan L. Fiechter, who was then serving as OTS's Deputy Director for Washington Operations. *See* OTS Order No. 92–515 (Dec. 4, 1992). Ryan also formally designated Fiechter "Acting Director." *See* OTS Order No. 92–514 (Dec. 4, 1992). Fiechter served in that position for about four years, resigning on October 8, 1996.

Two days later, President Clinton invoked the Vacancies Act to designate Nicolas P. Retsinas as Director of OTS:

### THE WHITE HOUSE

#### WASHINGTON

October 10, 1996

MEMORANDUM FOR THE HONORABLE NICOLAS P. RETSINAS.

Assistant Secretary of Housing and Urban Development

Pursuant to the Constitution and the laws of the United States, including section 3347 of title 5, United States Code, you are directed to perform the duties of the office of Director of the Office of Thrift Supervision, Department of the Treasury, effective October 10, 1996.

/s/ William J. Clinton

Within 120 days of Retsinas's ascension, President Clinton nominated Ellen Seidman to serve as Director of OTS. 143 CONG. REC. S1117 (daily ed. Feb. 6, 1997). The Senate confirmed Seidman on October 23, 1997, *see* 143 CONG. REC. S11,165, S11,171 (daily ed. Oct. 23, 1997), and she took over as Director shortly thereafter.

In the meantime, Retsinas had issued his written opinion and the cease and desist order. In doing so, Retsinas rejected the

Bank's motion to dismiss for lack of jurisdiction, a motion resting on the Bank's arguments that "Acting Director Jonathan Fiechter lacked authority to initiate this proceeding when he signed the notice of charges on September 20, 1993, and that the current Director's authority is defective under the Vacancies Act."

## II

The best way to approach the controversy about the Vacancies Act is to take up first the legality of Retsinas's tenure. If his status rendered the final order void, it will not matter whether his predecessor, Fiechter, had authority to initiate the administrative proceedings.

The Bank assumes the constitutionality of the Vacancies Act in general and, in particular, the constitutionality of § 3347, the section relied upon by the President in directing Retsinas to perform the Director's duties. The Bank believes, however, that the President's authority to use § 3347 expired long before he named Retsinas to the post. From this it concludes that Retsinas occupied the office illegally, in violation of not only the Appointments Clause, but also 12 U.S.C. § 1462a(c)(1), and that the cease and desist order he issued is therefore void. *See Ryder v. United States,* 515 U.S. 177, 115 S.Ct. 2031, 132 L.Ed.2d 136 (1995); *Federal Election Comm'n v. NRA Political Victory Fund,* 6 F.3d 821, 828 (D.C.Cir.1993).

The Vacancies Act, in its entirety, provides as follows:

### § 3345. Details; to office of head of Executive agency or military department

When the head of an Executive agency (other than the General Accounting Office) or military department dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

### § 3346. Details; to subordinate offices

When an officer of a bureau of an Executive department or military department, whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops.

### § 3347. Details; Presidential authority

Instead of a detail under section 3345 or 3346 of this title, the President may direct the head of another Executive department or military department or another officer of an Executive department or military department, whose appointment is vested in the President, by and with the advice and consent of the Senate, to perform the duties of the office until a successor is appointed or the absence or sickness stops. This section does not apply to a vacancy in the office of Attorney General.

### § 3348. Details; limited in time

(a) A vacancy caused by death or resignation may be filled temporarily under section 3345, 3346, or 3347 of this title for not more than 120 days, except that—

(1) if a first or second nomination to fill such vacancy has been submitted to the Senate, the position may be filled temporarily under section 3345, 3346, or 3347 of this title—

(A) until the Senate confirms the nomination; or

(B) until 120 days after the date on which either the Senate rejects the nomination or the nomination is withdrawn; or

(2) if the vacancy occurs during an adjournment of the Congress sine die, the position may be filled temporarily until 120 days after the Congress next convenes, subject thereafter to the provisions of paragraph (1) of this subsection.

(b) Any person filling a vacancy temporarily under section 3345, 3346, or 3347 of this title whose nomination to fill such vacancy has been submitted to the Senate may not serve after the end of the 120–day period referred to in paragraph (1)(B) or (2) of subsection (a) of this section, if the nomination of such person is rejected by the Senate or is withdrawn.

## § 3349. Details; to fill vacancies; restrictions

A temporary appointment, designation, or assignment of one officer to perform the duties of another under section 3345 or 3346 of this title may not be made otherwise than as provided by those sections, except to fill a vacancy occurring during a recess of the Senate.

5 U.S.C. §§ 3345–3349.

To identify the points of disagreement between the parties we need to work through the provisions step by step. The place to begin is § 3345 and § 3346. Is one or the other of these provisions applicable? The answer, both sides agree, is yes. OTS appears to be "an Executive agency" and so the position of Director is encompassed within § 3345. For the purpose of title 5, of which the Vacancies Act is a part, "Executive agency" includes "an independent establishment" in the Executive Branch. 5 U.S.C. §§ 104, 105. Given the location of OTS in the Treasury Department, the functions it performs and its statutory autonomy, OTS may fit this description. *See* 12 U.S.C. § 1462a(a) & (b)(3); *Energy Research Found. v. Defense Nuclear Facilities Safety Bd.,* 917 F.2d 581, 583 (D.C.Cir.1990); *Department of Justice v. Federal Labor Relations Auth.,* 39 F.3d 361, 365 (D.C.Cir.1995). Even if it is not within § 3345, OTS surely fits within § 3346. Located in the Treasury Department, OTS is a bureau of a "department." *Freytag v. Comm'r,* 501 U.S. 868, 886, 111 S.Ct. 2631, 2642–43, 115 L.Ed.2d 764 (1991). As we shall see, the Vacancies Act is concerned with positions requiring Presidential appointment. The Director of OTS is such a position and so the Director may be considered an "officer of a bureau of an Executive department" within § 3346's meaning.

The conditions for invoking § 3345 and § 3346 are the death, resignation, illness or absence of the official. When any one of these events occurs, the "first assistant"—if there is one—automatically fills the vacant position, unless the President, acting pursuant to § 3347, "direct[s]" someone else to perform the duties of the office. Under § 3347, the someone else must be an Executive officer holding another appointed posi-

tion for which he was confirmed by the Senate. Retsinas qualified. He had been confirmed by the Senate as Assistant Secretary of Housing and Urban Development and was serving in that capacity when President Clinton directed him to take over at OTS.

This brings us to § 3348. Of the four causes of a vacancy mentioned in the Act, two—illness and absence—are ordinarily transitory. Apparently for this reason, the Act contains no time limits regarding vacancies resulting from illness or absence. Vacancies resulting from death or resignation are another matter. Here there are time limits. Section 3348(a) provides that a vacancy caused by either of these events may be filled pursuant to § 3347 "for not more than 120 days." An exception to the 120–day limitation is provided if a nomination to fill the vacancy has been submitted to the Senate during this period, in which case an individual occupying the office may remain "until the Senate confirms the nomination," or until 120 days after the Senate rejects the nomination or the nomination is withdrawn. 5 U.S.C. § 3348(a)(1).

The Bank thinks § 3348's 120–day period lapsed before the President named Retsinas. A necessary, though unstated, premise of its argument is that the Vacancies Act may be used only when there is a vacancy caused by the departure (or absence) of an individual who had been appointed to the position in compliance with Article II of the Constitution. Otherwise, the departure of Retsinas's unappointed predecessor, Fiechter, could have caused a "vacancy" within the meaning of § 3348.

■ If one focused only on the introductory clause in § 3348(a)—"A vacancy caused by death or resignation"—it might be supposed that the departure of anyone occupying the office, even an unappointed acting official, could trigger the Vacancies Act. Viewed in context, however, it becomes clear that the statute contemplates only the death, resignation, illness or absence of someone appointed to the position by the President. The language quoted from § 3348(a) refers back to § 3345 and § 3346. Those provisions must be consulted to determine whose "death" or

whose "resignation" will create a vacancy that may be filled pursuant to the Act. Only the "head of an Executive agency and the head of a military department" are covered by § 3345. Only an "officer of a bureau of an Executive department or military department" is covered by § 3346. Generally an "officer" is someone:

(1) required by law to be appointed in the civil service by one of the following acting in an official capacity—

(A) the President;

(B) a court of the United States;

(C) the head of an Executive agency; or

(D) the Secretary of a military department

5 U.S.C. § 2104. Since we are dealing with the President's authority within the Executive Branch, we may put aside (B). *Cf. Morrison v. Olson*, 487 U.S. 654, 675–76, 108 S.Ct. 2597, 2610–11, 101 L.Ed.2d 569 (1988). We may also exclude (C) and (D) from the list: § 3345 deals with the heads of Executive agencies and military departments, not those appointed by them; and § 3346 relates only to an officer "whose appointment is not vested in the head of the department." This leaves only (A), that is, positions requiring Presidential appointment. It does not matter to our decision whether § 3345 and § 3346 cover inferior officers whose appointment Congress has vested in the President alone, as Article II, § 2, cl. 2, of the Constitution allows, or only officers whose Presidential appointment requires the consent of the Senate. At the least the person whose "vacancy" brings the Vacancies Act into operation must have ascended to the post through a Presidential appointment. There may be instances when a person, not constitutionally appointed, temporarily performs the duties of the "head of an Executive agency" (§ 3345) or of an "officer" in an Executive

bureau (§ 3346). The Vacancies Act itself gives rise to this prospect. But the person's performance of those duties does not make him "head of an Executive agency" or an "officer" in a department's bureau for the purposes of the Act. Otherwise, § 3348's time limitation could be easily avoided by a series of temporary replacements followed by resignations, with each resignation triggering a new 120–day period. *See* 16 Op. Att'y Gen. 596 (1880); 20 Op. Att'y Gen. 8, 9 (1891).

In short, § 3345 and § 3346—and thus § 3347—apply only to those vacancies caused by the departure of an officer of the Executive Branch who had been appointed by the President. Ryan was such an "officer." Fiechter was not. It follows that even if Fiechter had lawfully been serving as Acting Director, *his* resignation did not create a "vacancy" enabling the President to invoke the Vacancies Act and name Retsinas to the empty post. Only Ryan's departure triggered the President's authority under § 3347 to direct someone to perform the duties of the vacant position.

■ We now come to the heart of the controversy. Does the § 3348 clock begin ticking the moment there is a "vacancy" caused by the death or resignation of a constitutionally appointed officer? The Bank believes so. If the Bank is right, the deadline for filling the Director's position passed years before the President named Retsinas.[1] On the other hand, OTS and the Department of Justice as *amicus curiae* believe the time limit in § 3348 does not begin running until someone actually takes office pursuant to the Vacancies Act, either through a "detail" under § 3345 or § 3346 or through a Presidential directive pursuant to § 3347. On this view, Retsinas was lawfully serving as Director on March 29, 1997, when he issued the cease and desist order against the Bank.[2]

---

1. Ryan resigned as OTS Director on December 4, 1992, during an adjournment of the Congress *sine die*. *See* 138 CONG. REC. H12,606 (daily ed. Oct. 9, 1992); 138 CONG. REC. S17,707 (daily ed. Oct. 8, 1992). Congress reconvened on January 5, 1993. *See* 139 CONG. REC. S1 (daily ed. Jan. 5, 1993). Under the Bank's interpretation, § 3347 and § 3348 gave the President authority to direct another presidential appointee to take over the OTS Director's duties only until May 4, 1993, the

120th day of Congress's new session. *See* 5 U.S.C. § 3348(a)(2).

2. As OTS sees it, the President's directive of October 10, 1996, initially authorized Retsinas to perform the duties of the Director for 120 days, or until February 6, 1997. When the President nominated Ellen Seidman to fill the position of Director on the last day of the 120–day period, this extended Retsinas's term of service pursuant

The language of the Vacancies Act strongly supports OTS's position. Nothing in the Act expressly deals with the amount of time that may transpire before the President exercises his § 3347 authority to designate a temporary replacement. Section 3348 specifies a time limit in these terms: "[a] vacancy caused by death or resignation may be filled temporarily under section 3345, 3346 or 3347 of this title for not more than 120 days...." This language tells us how long the position may be "filled," not when the President must do the filling. The Bank would have a good case if § 3348 said the President must act "within" 120 days. But § 3348 says something quite different. The time limit is placed not on Presidential action, but on the tenure of the President's designee.

There will be instances when the 120–day period of service commences with the occurrence of the vacancy. This will happen when a "first assistant" is detailed to a vacant position by operation of § 3345 or § 3346, or when the President issues a § 3347 directive immediately upon the office holder's departure.[3] But when an officer who dies or resigns had no "first assistant" and the President does not immediately act pursuant to § 3347, the vacancy has not been "filled" under § 3348 and the 120–day period of service therefore has not begun to run.

As against this interpretation, the Bank stresses the word "When" at the beginning of § 3345 and § 3346. From this it concludes that both "sections take effect 'when' a vacancy arises"—which is accurate—and that the President has only 120 days to fill the vacant position, which is not accurate. It is not accurate for the reasons we have already given. Those reasons do not, as the Bank claims, lead us to a result in conflict with the history of the Act. It is the Bank's position that runs counter to history.

The origins of the modern Vacancies Act go back to the beginning of the nation. President Washington's first cabinet appointments—Hamilton for the Treasury Department, Knox for the War Department and Jefferson for State—were accomplished in a flash. Nominations were sent up one day in 1789; Senate confirmation followed on the same day, or the next. S. ELKINS & E. McKITTRICK, THE AGE OF FEDERALISM: THE EARLY AMERICAN REPUBLIC, 1788–1800, at 52 (1993). By the election year 1792, Congress must have realized that transitions might not always go so smoothly; that, in any event, some provision should be made for temporary absences and illnesses of Presidential appointees; and that, as Justice Holmes later put it, "the machinery of government would not work if it were not allowed a little play in its joints." *Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482 (1931). The Second Congress passed *An Act making alterations in the*

---

to § 3348(a)(2). Retsinas continued lawfully to exercise the powers of acting Director until the Senate confirmed Seidman on October 23, 1997.

**3.** For the first time in its reply brief, the Bank argues that Fiechter was actually Ryan's "first assistant," and therefore automatically succeeded to the position of the Director upon Ryan's resignation under § 3345 or § 3346. Hence the 120–day period began running immediately and the President's authority to invoke § 3347 expired during Fiechter's time in office. *See* 17 Op. Att'y Gen. 530, 531 (1883) ("When the vacancy is thus temporarily filled once for that period, the power conferred by the statute is exhausted; it is not competent to the President to appoint either the same or another officer to thereafter perform the duties of the vacant office for an additional period....").

The Bank's argument comes too late to be considered. *See Rollins Environmental Servs. (NJ), Inc. v. U.S. EPA*, 937 F.2d 649, 652 n. 2 (D.C.Cir.1991). Whether Fiechter was the Director's "first assistant" within the meaning of the Vacancies Act is far from so clear that the Bank did not have to raise the point in its opening brief or in the administrative proceedings. *See Marine Mammal Conservancy, Inc. v. Department of Agric.*, 134 F.3d 409, 411 (D.C.Cir.1998). Fiechter's official title was Deputy Director for Washington Operations. According to OTS, he was one of two deputy directors, and there is no statute or regulatory provision ranking the status of OTS employees. The governing statute itself names only one position—that of Director—and grants the Director discretion to hire all other staff. *See* 12 U.S.C. § 1462a(b) & (h); 12 C.F.R. § 500.10. If the position of "first assistant" is not created by statute, one line of authority indicates that § 3345 and § 3346 of the Vacancies Act do not apply. *See* 2 Op. Off. Legal Counsel 113, 115 n.5 (1978) (noting that the Attorney General's office has consistently interpreted the term "first assistant" as applying only to officials whose appointment has been specifically provided for by statute).

*Treasury and War Departments,* section 8 of which provided that "in case of the death, absence ... or sickness" of the Secretaries of State, Treasury or the War Department, or of any officer in those departments, "it shall be lawful for the President ... to authorize any person or persons at his discretion to perform the duties of the said respective offices until a successor be appointed, or until such absence or inability by sickness shall cease." Act of May 8, 1792, ch. 37, § 8, 1 Stat. 279, 281. Three years later, in 1795, during the second Washington administration, Congress enacted an amendment limiting the length of service of those occupying offices under section 8: "no one vacancy shall be supplied, in manner aforesaid, for a longer term than six months." Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.

Thus, from the beginning Congress limited how long the President's designee could serve, not how swiftly the President had to use this legislative authority to fill the vacancy. For the next half century, the same system remained in place. Congress took up the matter again in 1863, expanding the President's power to fill vacancies in "any Executive Department of the Government." Act of Feb. 20, 1863, ch. 45, 12 Stat. 656. The 1863 amendment also restricted the President's choice of replacements to officers in Executive Departments who had been previously appointed by the President to some other position, a restriction now reflected (as modified) in § 3347 of the present Vacancies Act. The six-month limitation on term of service remained unchanged.

In 1868 Congress repealed the existing statutes on the subject of vacancies and enacted in their stead a single statute reflecting prior law. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168–69; *see also* CONG. GLOBE, 40th Cong., 2d Sess. 1163 (1868) (remarks of Senator Trumbull). The 1868 Act provided that "in case of the death, resignation, absence, or sickness of the head of any executive department of the government, the first or sole assistant thereof shall" take over "until a successor be appointed or the absence or

sickness shall cease." Act of July 23, 1868, ch. 227, 15 Stat. 168. Instead of elevating the "first or sole assistant," the President could authorize any other constitutionally appointed officer to perform the duties of the vacant office until a successor was appointed or the prior occupant of the position was able to return to his post. *Id.*

When introduced on the floor of the Senate, the bill stated: "no one vacancy is to be supplied in this manner for a longer term than thirty days." Senator Fessenden objected, asking Senator Trumbull "if thirty days is not unnecessarily long?" CONG. GLOBE, 40th Cong., 2d Sess. 1163 (1868). The Senate agreed, and the final version provided, "That nothing in this act shall authorize the supplying as aforesaid a vacancy for a longer period than ten days when such vacancy shall be occasioned by death or resignation...." Act of July 23, 1868, ch. 227, § 3, 15 Stat. 168.

Congress amended the Vacancies Act several times after 1868. In 1891, it lengthened the 10–day limit to 30 days: a "vacancy occasioned by death or resignation must not be *temporarily filled* under [the Vacancies Act] for a longer period than thirty days." Act of Feb. 6, 1891, ch. 113, 26 Stat. 733 (emphasis added). In 1966, Congress recodified title 5, making a few minor changes in the statute's wording. In place of the introductory clause "In case of" the death, resignation, absence or sickness of an officer, the recodified version inserted the word "When," which is how § 3345 and § 3346 now begin. No "substantive changes" were intended. S. REP. No. 89–1380, at 20, 70–71 (1966). Congress amended the Act once more in 1988, expanding the time limit on service from 30 to 120 days. Entitled "Extension of Time for Interim *Service,*" Pub.L. No. 100–398, § 7(b), 102 Stat. 985, 988 (1988) (emphasis added), the amendment was meant to "change[ ] the amount of time a vacancy caused by death or resignation *may be filled* temporarily under section 3345, 3346 or 3347...." [4] S.REP. No. 100–317, at 23 (1988) (emphasis added).

---

4. The 1988 amendment also substituted "Executive agency" for "Executive department" in

§ 3345.

From the beginning, then, the various time limits—6 months, 10 days, 30 days and now 120 days—were placed on the tenure of the person occupying the office. While history is thus not on the Bank's side, it thinks policy is.[5] At oral argument, the Bank's counsel asked "what incentive would the President, any President, ever have to fill any office" if § 3348(a) limited only length of service (as we believe it does)? Transcript of Oral Argument at 20. The question is loaded. The Vacancies Act was never meant to give the President an "incentive" to fill vacant positions with appointees confirmed by the Senate. The function of the Act is to allow some breathing room in the constitutional system for appointing officers to vacant positions, to validate the actions of those temporarily occupying the positions. If no one is detailed or directed pursuant to § 3345, or § 3346, or § 3347, or if someone is named but the 120-day period in § 3348(a) expires, the position will either remain vacant or wind up being occupied by someone not constitutionally entitled to exercise the powers of the office.[6] In either situation, there will still be incentives for the President to send up a nominee to fill the vacancy. The incentives derive from the Appointments Clause of the Constitution and the political and legal consequences of staffing high positions with non-appointed "acting" officials. *See Ryder*, 515 U.S. at 182–183, 115 S.Ct. at 2035–36; *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

We therefore conclude that the President legally named Retsinas to serve as OTS Director pursuant to § 3347 and that Retsinas

lawfully occupied that position on March 29, 1997, when he issued the cease and desist order against the Bank.

## III

■ In addition to attacking Retsinas's status, the Bank, joined by an *amicus curiae*, argues that his predecessor, Fiechter, illegally exercised authority as Acting Director of OTS. Fiechter became Acting Director when outgoing Director Ryan delegated to him "all the powers of the Director." Although the OTS statute permits the Director to delegate "any power," 12 U.S.C. § 1462a(h)(4)(A)(ii), the Bank denies that it allows a Director to delegate "all powers" and then immediately resign, never to take back the reins or monitor the delegation. While the statute also authorizes an OTS Director to designate a replacement to serve in his "absence," 12 U.S.C. § 1462a(h)(4)(A)(i), the Bank contends that Ryan could not use this provision to designate Fiechter. An "absence," it says, is of limited duration, pending the return of the temporarily unavailable officer. Ryan resigned. He would never return. Ryan's leaving caused a "vacancy" and the statute provides explicitly for such an event: a "vacancy in the position of Director which occurs before the expiration of the term for which a Director was appointed" shall be filled by Presidential appointment with the consent of the Senate. *See* 12 U.S.C. § 1462a(c)(1) & (3). As the Bank sees it, to read these provisions otherwise would be to confer upon the Director of OTS the power to appoint singlehandedly his permanent successor, a power denied even the President.[7]

5. For more than a century, the Office of the Attorney General has interpreted the Vacancies Act to place time limits only on the length of the temporary replacement's service, not the length of time the office may remain vacant. *See* 25 Op. Att'y Gen. 258, 259 (1904) (stating that the ten day limitation in the Vacancies Act "was to be computed from the date of the President's action, and not from the time when the vacancy occurred"); 15 Op. Att'y Gen. 457, 458 (1878) (same). A footnote in a later Opinion of the Office of Legal Counsel (1 Op. Off. Legal Counsel 150, 152 n.1 (1977)) described two other Attorney General Opinions (15 Op. Att'y Gen. 596 (1880); 32 Op. Att'y Gen. 139 (1920)) as advising that the vacancy must be filled within the Act's time limit. The footnote is an inadvertent error.

Neither of those Attorney General Opinions supports that view.

6. Because we conclude that Retsinas was authorized to perform the duties of the Director of OTS under the Vacancies Act, we do not reach OTS's argument that the President has inherent power, beyond that granted him in the Vacancies Act, to make temporary designations to ensure that the laws are faithfully executed. The issue arose once before in this court in a stay application in *Williams v. Phillips*, 482 F.2d 669, 670 (D.C.Cir.1973).

7. One district court concluded that Ryan validly placed Fiechter in charge. *Office of Thrift Supervision v. Paul*, 985 F.Supp. 1465 (S.D. Fla.1997).

If the Bank is right, if Fiechter had no authority to issue the Notice of Charges, does it automatically follow that Retsinas's cease and desist order is invalid? [8] As to this question, the Bank is completely silent. There is not a word in its opening brief or its reply brief on the subject. OTS is of no help either. Without mentioning the question, it defends on the grounds that Fiechter lawfully occupied the Director's office, and that in any event the *de facto* officer doctrine or Retsinas's implicit ratification of the Notice saves the cease and desist order.

The parties may think it self-evident that an invalid Notice will cause the final order to be invalid, but we are far from certain about this. Our doubt stems from the last sentence of § 706 of the Administrative Procedure Act: on judicial review of agency action, "due account shall be taken of the rule of prejudicial error." This sentence "sums up in succinct fashion the 'harmless error' rule applied by courts in the review of lower court decisions as well as of administrative bodies," UNITED STATES DEPARTMENT OF JUSTICE, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 110 (1947), *reprinted in* ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, FEDERAL ADMINISTRATIVE PROCEDURE SOURCEBOOK 67, 176 (2d ed.1992). The rule tempers judicial consideration of challenges to "preliminary, procedural, or intermediate agency action," 5 U.S.C. § 704, in much the same way the harmless error rule affects appellate review of other types of cases. Take, for instance, *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), and *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). These Supreme Court decisions hold that irregularities in grand jury proceedings leading to indictment may be disregarded "unless such errors prejudiced the defendants." 487 U.S. at 254, 108 S.Ct. at 2373; *see* 475 U.S. at 71–72, 106 S.Ct. at 942–43. The petit jury's verdict of

guilty in *Mechanik* "rendered harmless any conceivable error in the charging decision that might have flowed from the violation." 475 U.S. at 73, 106 S.Ct. at 943. If one analogized the Notice of Charges against the Bank to a grand jury indictment, and the cease and desist order to a criminal conviction, harmless error analysis may mean that irregularities regarding the Notice should also be disregarded. Because the parties have not addressed the question, we will say no more. Still, what we have written thus far ties directly into a question the parties have addressed—whether Retsinas ratified Fiechter's action and thereby cured any deficiency caused by Fiechter's lack of lawful authority.

■ On the matter of ratification, the Supreme Court's decision in *Federal Election Commission v. NRA Political Victory Fund,* 513 U.S. 88, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994), is a useful starting point. The Federal Election Commission filed a petition for a writ of certiorari in the case. It had no authority to do so without the Solicitor General's approval, which it had not received. After the time for petitioning expired, the Solicitor General authorized the filing. As to whether the authorization had retroactive effect, the Supreme Court said that "the question is at least presumptively governed by principles of agency law, and in particular the doctrine of ratification." 513 U.S. at 98, 115 S.Ct. at 543. Ratification occurs when a principal sanctions the prior actions of its purported agent. *See* RESTATEMENT (SECOND) OF AGENCY § 82 (1958). But it is "essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made." *NRA Political Victory Fund,* 513 U.S. at 98, 115 S.Ct. at 543 (citing *Cook v. Tullis,* 85 U.S. (18 Wall.) 332, 338, 21 L.Ed. 933 (1873)); *see also* RESTATEMENT (SECOND) OF AGENCY, *supra,* § 90, Com-

---

**8.** A notice of charges may be issued when the agency has "reasonable cause to believe" that the respondent is engaging in unsafe or unsound practices or is otherwise violating the law. 12 U.S.C. § 1818(b)(1). The notice is in the nature of a complaint. In issuing a notice, the OTS Director is performing a prosecutorial function. Ultimately, the Director may perform a different

role in the same case, acting as a quasi-judicial officer passing judgment on the evidence bearing on the charges. Although the Administrative Procedure Act generally forbids agency personnel from engaging in both the prosecution and the decision of a case, an exemption permits a member of the body comprising the agency to wear both hats. *See* 5 U.S.C. § 554(d)(2)(C).

ment a ("The bringing of an action, or of an appeal, by a purported agent can not be ratified after the cause of action or right to appeal has been terminated by lapse of time."). In *NRA,* the Solicitor General's ratification came too late; the time for petitioning had expired. And so the Court dismissed the certiorari petition for lack of jurisdiction.

The timing problem posed in *NRA* is not present here. No statute of limitations would have barred Retsinas from reissuing the Notice of Charges himself and starting the administrative proceedings over again. It is as if, in *NRA,* there had been no time limit on petitioning for certiorari and the Solicitor General had approved the FEC's filing after the fact. In those circumstances the Court presumably would have come out the other way. *See Forbes Pioneer Boat Line v. Board of Comm'rs,* 258 U.S. 338, 339, 42 S.Ct. 325, 325–26, 66 L.Ed. 647 (1922). On the other hand, the situation in this case is not easily characterized as between a principal—Retsinas—and an agent—Fiechter. They were never even at OTS together. Fiechter and Retsinas might both be viewed as agents of the United States. There is some authority for the proposition that one agent may ratify the acts of another, RE-STATEMENT (SECOND) OF AGENCY, *supra,* § 93(3), but we need not go down this path. While *NRA* is not directly on point, a precedent of this circuit is.

In *Federal Election Commission v. Legi–Tech, Inc.,* 75 F.3d 704 (D.C.Cir.1996), the

FEC brought an enforcement action against Legi–Tech after finding probable cause to believe a violation of the election laws had occurred. In response to another decision of this court holding that the FEC was unconstitutionally constituted, the FEC cured the illegality and the newly constituted commission ratified the pending enforcement action. We sustained the ratification despite misgivings about whether the new FEC had engaged in a "real fresh deliberation." [9] *Id.* at 707, 709.

To some extent, the *Legi–Tech* decision echoes the harmless error analysis mentioned previously. Forcing the FEC to "repeat the entire administrative process and, only thereafter, ... bring suit," we thought, would promise "no more detached and 'pure' consideration of the merits of the case than the Commission's ratification decision reflected." *Id.* at 708, 709. The situation here is somewhat different, but not in ways that assist the Bank. We have no doubt that Director Retsinas made a detached and considered judgment in deciding the merits against the Bank. Rather than simply writing a letter or a memorandum adopting the Notice of Charges as his own, he acted in the normal course of agency adjudication. His reasoned conclusion that the Bank violated the law as the Notice of Charges had alleged was necessarily an affirmation of the validity of the charges,[10] and hence a "ratification," even though he did not formally invoke the term.[11] *See Andrade v. Regnery,* 824 F.2d

**9.** The Federal Election Commission must engage in a lengthy, elaborate series of administrative steps involving investigation and deliberation before it votes to bring an enforcement action in court. *See, e.g., Federal Election Comm'n v. Rose,* 806 F.2d 1081, 1082–83 (D.C.Cir.1986) (describing a two-year long investigation before the Commission filed suit); *Common Cause v. Federal Election Comm'n,* 489 F.Supp. 738, 741–42 (D.D.C.1980) (describing a three-year long investigation).

**10.** The Notice charging the Bank with violating OTS's regulations and engaging in "unsafe and unsound" practices, listed five such practices. In his recommended decision, the ALJ concluded that the Bank had committed seven separate regulatory violations based on these same practices. Retsinas's decision and order confirmed the ALJ's conclusions of law.

**11.** The Bank protests that sustaining the cease and desist order on the basis of ratification is a "post hoc rationalization," and therefore cannot be relied upon to support the agency's action. Of course we may not "substitute our judgment for that of the agency...." *Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 93 (D.C.Cir.1995). But OTS is not claiming that ratification was the "basis" for the cease and desist order. Retsinas issued the order after reviewing the evidence, explaining his reasons, and concluding that the Bank had violated the law. *See supra* note 9. This had the legal consequence of ratifying Fiechter's Notice of Charges, representing as it did an affirmation of the decision to commence an enforcement proceeding, even though Retsinas did not say as much. *See* Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 DUKE L.J. 199, 224.

1253, 1257 (D.C.Cir.1987). We are also sure that redoing the administrative proceedings would bring about the same outcome—a cease and desist order against the Bank. To require another Director sign a new notice containing charges already found to be supported, not merely by probable cause, but by substantial evidence would do nothing but give the Bank the benefit of delay (assuming that we would refuse to stay our judgment pending reinstitution of agency proceedings against the Bank). Because we hold that Retsinas effectively ratified the Notice of Charges signed by Fiechter at a time when he could have initiated the charges himself, we do not decide whether Fiechter lawfully occupied the position of Director.[12]

## IV

In addition to challenging the authority of Fiechter and Retsinas, the Bank complains that its procedural rights were denied and that the Director's findings were unsupported by substantial evidence in the record. None of the Bank's arguments in support of these contentions warrants discussion. After reviewing the record, we have concluded that the decision was supported by substantial evidence, and that the Bank was not denied the procedural protections afforded it under OTS's statutes and regulations.

*The petition for judicial review is denied.*

12. Nor do we address the argument that Fiechter's actions should be validated under the de

facto officer doctrine.