# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 12, 2015        Decided August 11, 2015

No. 14-1068

INTERCOLLEGIATE BROADCASTING SYSTEM, INC.,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
APPELLEES

COLLEGE BROADCASTERS, INC. AND SOUNDEXCHANGE, INC.,
INTERVENORS

---

On Appeal From the Copyright Royalty Board

---

*John R. Grimm* argued the cause for appellant. With him on the briefs were *Timothy J. Simeone* and *Christopher J. Wright.*

*Sonia K. McNeil*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Mark R. Freeman*, Attorney.

*Matthew S. Hellman* argued the cause for intervenor SoundExchange, Inc. With him on the brief were *Michael B. DeSanctis* and *Ishan K. Bhabha*. *David A. Handzo* entered an appearance.

2

*David D. Golden* and *Catherine R. Gellis* were on the brief for intervenor College Broadcasters, Inc. in support of appellees.

Before: GARLAND, *Chief Judge*, and SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Intercollegiate Broadcasting System, Inc., appeals a determination by the Copyright Royalty Board setting royalty rates for webcasting. Three years ago, we vacated and remanded the Board's prior determination on this subject, concluding that its members had been appointed in violation of the Constitution's Appointments Clause. Thereafter, the Librarian of Congress appointed a new Board, which made the determination at issue here. Intercollegiate contends that the new Board's determination again violated the Appointments Clause because it was tainted by the previous Board's decision. The appellant also disputes the merits of the Board's determination. For the reasons set forth below, we reject both challenges.

I

Intercollegiate Broadcasting System (IBS) is a nonprofit association that represents college and high school radio stations, which historically broadcasted over the air. Many of its member stations are now involved in webcasting -- the digital transmission of sound recordings over the Internet by, for example, Internet radio music services.

In 1995, Congress amended the Copyright Act to grant the owner of a sound recording copyright the exclusive right to publicly perform the copyrighted work by means of a digital audio transmission. *See* Digital Performance Right in Sound

Recordings Act of 1995, sec. 2, § 106(6), Pub. L. No. 104-39, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)). This right is now subject to certain limitations. Most relevant to this appeal, subsequent amendments in the Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998), "created a statutory license in performances by webcast, to serve Internet broadcasters and to provide a means of paying copyright owners." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.* (*Intercollegiate I*), 574 F.3d 748, 753 (D.C. Cir. 2009) (internal quotation marks omitted); *see* 17 U.S.C. § 114(d)(2). These licenses permit entities other than the copyright owner to use and perform the copyrighted sound recordings without the copyright holder's permission. In exchange, the licensees -- here, webcasters -- must pay royalty fees to the copyright owner as required by the statute. *See Indep. Producers Grp. v. Library of Congress*, 759 F.3d 100, 101 (D.C. Cir. 2014). Such royalties are normally paid to copyright owners through third-party clearinghouses like the intervenor in this case, SoundExchange, Inc.

In the Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341, Congress created the Copyright Royalty Board within the Library of Congress. The Board is composed of three Copyright Royalty Judges, appointed by the Librarian of Congress, and is authorized to determine rates and terms for the licensing and use of copyrighted works in (inter alia) webcasting. *See* 17 U.S.C. §§ 114(f), 801(b)(1). If the parties voluntarily agree on rates and terms, the Act directs the Board to adopt their agreement. *See id.* § 114(f)(3). If the parties fail to agree, the Board must hold adversarial proceedings governed by the statute and its regulations to determine "reasonable" royalty rates and terms for the license period in question. *Id.* § 114(f)(2)(A); *see id.* § 803; 37 C.F.R. §§ 351.1 *et seq*. The Board's final determination is governed by the standards set forth in the Act. As relevant here,

the Board must "distinguish among the different types" of services and must determine "a minimum fee for each such type of service." 17 U.S.C. § 114(f)(2)(B). The final rates and terms must be those that "most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* Following a review for legal error by the Register of Copyrights, *id.* § 802(f)(1)(D), the Librarian of Congress publishes the determination in the Federal Register, *id.* § 803(c)(6).

In January 2009, the Board initiated a proceeding to establish the rates and terms for the public performance of digital sound recordings for the 2011-2015 period. Most participants reached settlements during the voluntary negotiation period prescribed by the statute. *See* Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, 79 Fed. Reg. 23,102, 23,102 (Apr. 25, 2014) [hereinafter 2014 Final Determination]; *see also* 17 U.S.C. § 803(b)(3). The Board held an evidentiary hearing for the remaining participants, including Intercollegiate. The Board received written and live testimony from fifteen witnesses and admitted sixty exhibits into evidence. *See* 79 Fed. Reg. at 23,104. The record also included written and oral argument of counsel. *See id.* The Board issued a final determination on March 9, 2011. *See* Digital Performance Right in Sound Recordings and Ephemeral Recordings, 76 Fed. Reg. 13,026 (Mar. 9, 2011) [hereinafter 2011 Final Determination]. Among other things, the determination included a $500 per station or per channel annual minimum fee for all commercial and noncommercial webcasters.

Intercollegiate appealed the 2011 final determination, contending both that the Judges were appointed in violation of the Appointments Clause, and that the minimum fee was unlawful as applied to "small" and "very small" noncommercial

webcasters.  This court agreed with the former challenge and did not reach the latter.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalte Bd.* (*Intercollegiate II*), 684 F.3d 1332 (D.C. Cir. 2012).  We determined that Congress had vested the Judges, who could not be removed except for cause, with sufficient authority and independence to qualify as "principal" officers of the United States.  *Id.* at 1336-41.  Under the Appointments Clause, however, principal officers must be appointed by the President and confirmed by the Senate.  *See* U.S. CONST. art. II, § 2, cl. 2.  To "cure[] the constitutional defect with as little disruption as possible," we declared invalid and severed the statutory provision that barred the Librarian of Congress from removing the Judges without cause.  *Intercollegiate II*, 684 F.3d at 1336-37, 1340.  "Once the limitations on the Librarian's removal authority are nullified," we said, the Judges "become validly appointed inferior officers."  *Id.* at 1341.  Because the Judges were not validly appointed at the time they issued the challenged determination, however, we vacated and remanded that determination without reaching the merits of Intercollegiate's challenge.  *Id.* at 1342.

Thereafter, the Librarian appointed three new Copyright Royalty Judges to replace the previous Judges.  The new Judges directed the parties to submit proposals regarding how to proceed on the remand.  Unsurprisingly, the parties proposed nearly opposite ways forward.  SoundExchange initially proposed that the Judges "reinstate the Final Determination in its entirety without undertaking further proceedings." SoundExchange's Mot. Concerning Conduct of Proceedings on Remand 1 (J.A. 173).  Intercollegiate said the Judges should reopen proceedings and permit additional written and oral testimony and briefing.  *See* IBS's Proposal for Conduct of Remand 1 (J.A. 194).

After reviewing the parties' proposals, the Board issued a preliminary Notice of Intention to Conduct a Paper Proceeding on Remand. The Notice contained several key points. First, the Board interpreted this court's remand as directing it to review the entire record and to issue a new determination on all issues, not just the $500 minimum fee that Intercollegiate had challenged on appeal. Notice of Intention to Conduct Paper Proceeding on Remand 4 (J.A. 221) [hereinafter Notice]. Second, because the court did not reach the merits of the dispute, the Board understood that it "could, after an appropriate process, issue a new final determination that . . . reaches the same conclusions . . . as the prior Final Determination." *Id.* at 5 (J.A. 222). The Board recognized, however, that it was "also free to reach completely different conclusions in [its] new final determination." *Id.* Third, the Board decided neither to "rubber stamp" the prior Board's decision, nor to conduct a "complete 'do over' of the entire original process." *Id.* at 6 (J.A. 223). Instead, it would conduct an independent, de novo review of the entire written record of the proceeding. *Id.* at 7 (J.A. 224). The Board decided not to hold new evidentiary hearings because Intercollegiate had "fail[ed] . . . to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final Determination that turned on witness credibility." *Id.* Likewise, the Board decided not to accept additional submissions because "no party ha[d] provided any specific reason . . . to reopen the record," and because each party "had ample opportunity to present its case." *Id.*

In sum, the Board concluded that "it would be neither fair, nor efficient, nor economical to proceed . . . with additional submissions, discovery, and evidentiary hearings." Notice at 7-8 (J.A. 224-25). Accordingly, as authorized by 17 U.S.C. § 803(b)(5), the Board stated its intention to "conduct[] only a paper proceeding, consisting of a review of the existing record

in this proceeding, and then issu[e] a determination at the conclusion of that review." *Id.* at 9 (J.A. 226). The Board established a ten-day period for comments on the Notice. "[T]o the extent that any party disagree[d]" with the plan to go forward with a paper proceeding, the Board directed such party to "identify in its comments to this notice *specific* examples where it believes the outcome of the original proceeding turned on elements, such as witness demeanor, that are not readily determined from a review of the written record." *Id.*

After the end of the comment period, the Board announced that it would "proceed with [its] consideration *de novo* on the existing record" and would "accept no further submissions." Order Following Notice of Intention to Conduct Paper Proceeding (J.A. 233). The Board issued its preliminary written determination on January 9, 2014. *See* 2014 Final Determination, 79 Fed. Reg. at 23,103. On April 25, 2014, the Board issued the final determination at issue on this appeal. *See id.* at 23,102. Once again, the final determination imposed a $500 per station or per channel annual minimum fee for both commercial and noncommercial webcasters. *See id.* at 23,122-24. As in the 2011 final determination, the Board rejected Intercollegiate's proposal to impose lower annual fees on "small" and "very small" noncommercial webcasters. *Id.* at 23,123.

Intercollegiate filed a timely appeal of the Board's final determination to this court, which has jurisdiction pursuant to 17 U.S.C. § 803(d)(1). Intercollegiate contends that the Board's determination violated the Appointments Clause again. It also challenges the merits of the determination insofar as it requires Intercollegiate's members to pay $500 per year. Reply Br. 4 & n.1. SoundExchange, the nonprofit entity responsible for distributing statutory royalties for the 2011-2015 period, *see* 37 C.F.R. § 380.2, intervened to defend the determination.

8

II

Intercollegiate's principal contention is that the new Board's determination violated the Appointments Clause because it was "still tainted by the Appointments Clause violation that originally led this Court to remand" the previous Board's determination. Intercollegiate Br. 15. We consider that constitutional challenge de novo. *See Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 737 (D.C. Cir. 2011).

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2. As we have noted, this court vacated and remanded the previous Board's 2011 determination of webcasting rates because the Copyright Royalty Judges who made that determination had been appointed in violation of the Clause. *Intercollegiate II*, 684 F.3d at 1342. The Librarian of Congress responded by replacing the three original Judges with three new ones, appointed under the statute with the offending provision severed and with the power to reconsider the matter de novo.

Intercollegiate does not dispute that the three new Judges were properly appointed by the Librarian under the Appointments Clause. Rather, it contends that, "[b]y merely reviewing *de novo* their predecessors' proceedings instead of conducting their own proceeding permitting firsthand credibility determinations and evidentiary rulings, the Judges did nothing more than enshrine the constitutional violations that this Court sought to cure." Intercollegiate Br. 15. We disagree.

9

A

This court has twice before considered the validity of decisions made after the replacement of an improperly appointed official. Both cases support the validity of a subsequent determination when -- as here -- a properly appointed official has the power to conduct an independent evaluation of the merits and does so.

1. In *FEC v. Legi-Tech*, we held that a properly reconstituted Federal Election Commission (FEC) could reauthorize pending enforcement actions that had been initiated by an unconstitutionally constituted Commission. 75 F.3d 704, 706 (D.C. Cir. 1996). In an earlier case, another panel of this court had held that a provision of the Federal Election Campaign Act, placing two congressional officers on the Commission as ex officio members, violated constitutional separation-of-powers principles. *See FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993). That case also held that the ex officio provision was severable. *Id.* at 827-28. Thereafter, the Commission voted to reconstitute itself and exclude the ex officio members. The reconstituted Commission then considered the pending actions, deliberated for three days, and voted to continue the actions against the defendant. This was sufficient to cure the constitutional violation, we said, notwithstanding the possibility that the Commission may have in fact "rubberstamp[ed]" the enforcement action. *Legi-Tech*, 75 F.3d at 708-09.[1]

---

[1]*See Doolin Sec. Sav. Bank, F.S.B. v. Office of Thrift Supervision*, 139 F.3d 203, 213 (D.C. Cir. 1998) (describing "misgivings" in *Legi-Tech* about "whether the new FEC had engaged in a real fresh deliberation" (internal quotation marks omitted)); *see also Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987) (finding no Appointments Clause violation where a properly appointed official

In *Doolin Security Savings Bank, F.S.B. v. Office of Thrift Supervision*, we again affirmed the ability of a properly appointed officer to uphold the decision of one who was not. 139 F.3d 203, 213-14 (D.C. Cir. 1998). There, the agency persuaded us that a validly appointed agency director had "made a detached and considered judgment" in ratifying the previous director's decision. *Id.* Because the new director "effectively ratified the [previous director's] Notice of Charges . . . at a time when he could have initiated the charges himself," it was not even necessary to decide whether the previous director had "lawfully occupied the position." *Id.* at 214.

These precedents make clear that the new Board's de novo determination that a $500 annual fee was proper did not violate the Appointments Clause. Intercollegiate seeks to avoid this result by overstating the importance of particular facts in each case.

Intercollegiate argues that *Legi-Tech* is distinguishable because it was based in part on the practical futility of remanding to the Commission for new proceedings because the Commission's voting membership had not changed. Under such circumstances, we said, "forcing the Commission to start at the beginning of the administrative process, given human nature, promises no more detached and 'pure' consideration of the merits." *Legi-Tech*, 75 F.3d at 709. But Intercollegiate's argument proves too much. It implies that the Board's determination would be less vulnerable had the Librarian retained the three original Judges -- who, we held, became "validly appointed inferior officers" once "the limitations on the Librarian's removal authority [were] nullified," *Intercollegiate*

---

with final authority, but who had been in office only three days, ratified and implemented a program that had been extensively planned by his improperly appointed predecessor).

*II*, 684 F.3d at 1341 -- rather than replaced them with new individuals.  We doubt that Intercollegiate would regard those original Judges as more independent than their replacements. Indeed, because *Legi-Tech* held that ratification by a reconstituted Commission with the same voting members was sufficient to satisfy the Appointments Clause, it follows a fortiori that a de novo determination by a Copyright Royalty Board with all new members was sufficient as well.

Intercollegiate also seeks to distinguish both *Legi-Tech* and *Doolin* on the ground that they involved administrative enforcement actions -- "an area of traditionally broad discretion" -- rather than the exercise of judicial authority in an adversarial proceeding.  Intercollegiate Br. 25-26 & n.52.  But neither *Legi-Tech* nor *Doolin* rested its holding on that ground.[2]  Moreover, this court subsequently suggested that the logic of *Legi-Tech* and *Doolin* would apply in the adjudication context as well:  in a case vacating an order issued by a two-person National Labor Relations Board (NLRB) that we found lacked a statutory quorum, we suggested that ratification by a properly constituted Board would be appropriate.  *See Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 476 (D.C. Cir. 2009) (citing *Legi-Tech*, 75 F.3d 704); *cf. Fortuna Enters., LP v. NLRB*, 789 F.3d 154, 158 (D.C. Cir. 2015) (reviewing an NLRB decision that "reinstat[ed] and incorporat[ed] by reference" a prior decision issued by a two-person Board).[3]

---

[2]*Legi-Tech* mentioned the point in a single sentence, after the court had already rejected the appellee's challenge and immediately before introducing a further rejection with the clause, "In any event." 75 F.3d at 709.

[3]In a footnote, Intercollegiate suggests that *Doolin* is also distinguishable because it included a question as to whether the previous director in that case was validly appointed under the

2. Intercollegiate maintains that two Supreme Court cases stand for the proposition that the only way to remedy the exercise of judicial authority by invalidly appointed judges is for the new judges to "conduct a new *hearing*, not merely a *de novo* review of the record assembled by the constitutionally invalid tribunal." Intercollegiate Br. 20. Neither case stands for that proposition.

In the first case Intercollegiate cites, *Ryder v. United States*, the Supreme Court held only that an Appointments Clause violation arising out of a decision rendered by an improperly constituted tribunal was not remedied through appellate review by a properly constituted body with a narrower scope of authority. 515 U.S. 177, 187-88 (1995). *Ryder* involved a member of the United States Coast Guard who was convicted by a court-martial. Two appellate courts -- the Coast Guard Court of Military Review, followed by the United States Court of Military Appeals -- affirmed his conviction. Ryder argued to the Court of Military Appeals that two members of the Coast Guard Court had been appointed in violation of the Appointments Clause. *Id.* at 179. Although the Court of Military Appeals agreed that the appointments violated the Clause, it nonetheless affirmed the intermediate court's ruling. *Id.* at 179-80.

The Supreme Court reversed, rejecting the government's argument that any defect in the Coast Guard Court "was in effect cured by the review available to petitioner in the Court of Military Appeals." *Id.* at 186. Because the Coast Guard Court "had broader discretion to review claims of error, revise factual

Vacancies Act. Intercollegiate Br. 28 n.54. But the court held that, notwithstanding whether the previous director was validly appointed under either the Vacancies Act or the Appointments Clause, *Doolin*, 139 F.3d at 205, 207, the new director could ratify the previous director's decision. *Id.* at 212-14 (citing *Legi-Tech*, 75 F.3d 704).

determinations, and revise sentences than" the Court of Military Appeals did, the Supreme Court concluded it "simply cannot be said . . . that review by the properly constituted Court of Military Appeals gave petitioner all the possibility for relief that review by a properly constituted Coast Guard Court . . . would have given him." *Id.* at 187-88.  The Supreme Court therefore held that Ryder was "entitled to a hearing before a properly appointed panel of that court." *Id.* at 188.

We agree with Intercollegiate insofar as it argues *Ryder* stands for the proposition that review by a properly appointed body *can* be insufficient to cure an Appointments Clause violation.  But it does not stand for the proposition that *de novo* review is insufficient.  To the contrary, the problem *Ryder* identified was that the reviewing court (the Court of Military Appeals) did not have authority to conduct a de novo review (as did the Coast Guard Court).  *Id.* at 187.  Nor does *Ryder* stand for the proposition that the *only* remedy for an Appointments Clause violation is a new evidentiary hearing regardless of the scope of the reviewing court's authority.  Intercollegiate's only support for that claim is a single sentence at the end of the Court's opinion, which stated that Ryder was "entitled to a hearing before a properly appointed panel." *Id.* at 188.  Nothing in that sentence suggests that a new hearing would have been required if the reviewing court had possessed de novo authority.  Nor does anything suggest that such a hearing would have to involve live witnesses or additional evidence.[4]

---

[4] *Cf. United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 241 (1973) (holding that a statute's use of the word "hearing" did not "by its own force require [an agency] either to hear oral testimony, to permit cross-examination . . . , or to hear oral argument"); Henry J. Friendly, *"Some Kind of Hearing*,*"* 123 U. PA. L. REV. 1267, 1281 (1975) (noting that a "hearing" may include a proceeding based on written, rather than oral, presentations).

In the case before us, the original Copyright Royalty Board did not have "broader discretion," *Ryder*, 515 U.S. at 187-88, than did the new Board. To the contrary, the new Board had full authority to make its own determination, including the discretion to do so after a completely new proceeding or a de novo review of the record. Although it chose the latter, it did so of its own accord. Thus, unlike in *Ryder*, here it *can* be said that "review by the properly constituted [Board] gave [Intercollegiate] all the possibility for relief that review by a properly constituted [original Board] would have given [it]." *Id.* at 187-88. Accordingly, Intercollegiate did indeed have "a hearing before a properly appointed panel," *id.* at 188, of Copyright Royalty Judges.

The second case Intercollegiate cites, *Wingo v. Wedding*, did not involve the Appointments Clause at all and is even further afield. 418 U.S. 461 (1974). In *Wingo*, the Court held that a court's local rule authorizing magistrate judges to conduct evidentiary hearings in federal habeas corpus proceedings was invalid because it was precluded by the Federal Magistrates Act. *Id.* at 472. The Court further held that, because the Act required a district court judge to "personally hold evidentiary hearings," the invalidity of the rule was not cured by a provision requiring the district court to review a recording of the evidentiary hearing de novo. *Id.* at 472-74.

Thus, *Wingo* does not, as Intercollegiate insists, stand for the general proposition that "*de novo* review of an existing record is an inadequate remedy where a validly appointed judge exceeds the scope of his legal authority." Intercollegiate Br. 23. Rather, it stands for the proposition that such review is inadequate when a statute expressly requires the reviewing judge to personally hold an evidentiary hearing. The statute governing Board proceedings lacks any equivalent requirement that the Judges hold live hearings. To the contrary, it expressly permits

them to proceed on the paper record alone. *See* 17 U.S.C. § 803(b)(5); *see also id.* § 803(b)(6)(C)(iii) ("Hearsay may be admitted in proceedings under this chapter to the extent deemed appropriate by the Copyright Royalty Judges.").

B

Intercollegiate further maintains that, even if independent review of a prior record by a properly constituted Board may be sufficient to cure an Appointments Clause violation, the Board's determination on remand was "not independent of the earlier Board's reasoning, but rather was incurably tainted by it." Intercollegiate Br. 24. The appellant's arguments about the Board's lack of independence are unpersuasive.

1. First, Intercollegiate makes a number of general arguments. It argues that the fact that the new Judges' determination was "substantially identical" to that of the prior Judges "undermine[s] the pretense that the Judges' decision was fully independent." Reply Br. 10. Although Intercollegiate acknowledges that the new determination differs from the previous one on a number of points that it does not challenge on this appeal, *see id.* at 10 & n.9; Board Br. 18 n.4, it emphasizes that the Board "adopted a rate structure that is overwhelmingly (if not entirely) identical to the one this court vacated," Reply Br. 11. As our precedents show, however, once a new Board has been properly appointed (or reconstituted), the Appointments Clause does not bar it from reaching the same conclusion as its predecessor. *See Legi-Tech*, 75 F.3d at 708-09; *Doolin*, 139 F.3d at 213-14; *see also Andrade v. Regnery*, 824 F.2d 1253, 1257 (D.C. Cir. 1987). Identifying an Appointments Clause infirmity in a decision does not guarantee that a party will get the merits decision it wants.

Intercollegiate next seeks to infer a lack of independence from the way the Judges characterized their task. Noting that, in denying Intercollegiate's motion for rehearing, the Judges described their role as "'pick[ing] up the process where th[e] earlier Judges left off,'" Intercollegiate insists that they thus "implicitly validate[d] every decision that led to the point where the 'earlier Judges left off.'" Intercollegiate Br. 30 (emphasis omitted) (quoting Order Denying Mot. for Reh'g 2 (J.A. 235)). But this takes the Judges' statement badly out of context. The Judges made that remark in rejecting Intercollegiate's assertion that the new panel had "improperly delegated responsibility for holding hearings" to the prior panel. Order Denying Mot. for Reh'g 2 (J.A. 235). As the Judges explained:

> This assertion confuses "delegation" with "succession." This is not a case where the Judges delegated the job of holding hearings to a subordinate administrative law judge. The current Judges succeeded to the positions of the earlier Judges and picked up the process where those earlier Judges left off.

*Id.* (internal citation and quotation marks omitted). The Judges then went on to emphasize that the "current panel weighed and analyzed the record *de novo*." *Id.* at 3 (J.A. 236).

The Judges had earlier declared, in their Notice of Intention to Conduct a Paper Proceeding, that they were "free to reach completely different conclusions in their new final determination" than the prior Judges reached. Notice at 5 (J.A. 222). After completion of the comment period that followed that notice, the Judges announced that they would "proceed with their consideration *de novo* on the existing record." Order Following Notice of Intention (J.A. 233). Thereafter, the Judges' final determination confirmed that they had decided the

matter "based upon a *de novo* review of the substantial record that the parties developed during the proceeding leading to the first determination." 2014 Final Determination, 79 Fed. Reg. at 23,103. We think it beyond peradventure that the Judges understood their task to involve a de novo determination.

2. We find equally unpersuasive Intercollegiate's miscellaneous attempts to identify specific indications of the previous Judges' hidden influence on their successors.

Intercollegiate notes that, although the regulations permit the Board to conduct a papers-only hearing, here the Board "did not conduct a review of just the papers," but instead also reviewed the record and transcripts from the prior proceeding. Intercollegiate Br. 31-32 (emphasis omitted). But if this is a problem of any kind, it is not a constitutional problem; nothing in the Appointments Clause instructs properly appointed officials to conduct proceedings in any particular way. Whether it constitutes a problem of administrative procedure is a question we address below. *See infra* Part III.

Intercollegiate attempts to transmute this procedural issue into a constitutional one by focusing on the relationship between the new Judges and their predecessors. In particular, Intercollegiate argues that "the new Judges refused to consider any argument or evidence not *assembled by* their unconstitutionally appointed predecessors." Reply Br. 1 (emphasis added). But the phrase "assembled by" is misleading. As the Board emphasized in denying rehearing, "the *parties* to that hearing created the record," based on the evidence that they themselves, including Intercollegiate, submitted. Order Denying Mot. for Reh'g 2 (J.A. 235). There is no Appointments Clause problem in limiting Intercollegiate to the evidence that it decided, on its own volition, to submit to the previous Board.

Relatedly, Intercollegiate maintains that it has "never had an opportunity to oppose the fee before a panel of judges whose appointment does not offend the Constitution." Reply Br. 2. But again, that is incorrect. All of its original arguments were presented, in paper form, to the new Board. And the Board gave Intercollegiate the further *opportunity* to argue that such a paper proceeding was insufficient: the Board expressly invited the parties to identify any reason why they should not proceed on the prior record. *See* Notice at 2, 9 (J.A. 219, 226). Intercollegiate did submit comments arguing for a new evidentiary hearing, but the new Board rejected those arguments, concluding that "[e]ach party has had ample opportunity to present its case." *Id.* at 7 (J.A. 224). Again, whether this contravened rules of administrative procedure is an issue we address below. *See infra* Part III. But it is not an Appointments Clause problem.

Intercollegiate also insists that the "oral testimony the Judges reviewed was taken by the original Board, subject to the original Judges' evidentiary rulings, and is therefore tainted by the original Board's constitutional infirmity." Intercollegiate Br. 32. But that, too, is incorrect. Intercollegiate maintains that, "if the new Judges disagree[d] with an evidentiary ruling excluding testimony, they ha[d] no way of reversing it." *Id*. at 32 n.66. In fact, the reconstituted Board had full authority to review de novo and reject any of the original Board's evidentiary rulings. Indeed, in each circumstance in which the prior Board had excluded evidence, the new Board concluded, de novo, that the exclusion was appropriate. *See* 2014 Final Determination, 79 Fed. Reg. at 23,122 n.60; *id.* at 23,123. Moreover, with respect to the excluded evidence that Intercollegiate principally presses, which related to the finances of smaller webcasters, the new Board went on to explain why, even if the evidence were admitted, it would not support Intercollegiate's rate proposal.

*See id.* at 23,123; Order Denying Mot. for Reh'g 4 (J.A. 237); *see also infra* Part IV.B.

Intercollegiate further contends that the Board's determination lacked independence because it included quotations from a "colloquy between the earlier Judges and counsel" during oral argument in the prior proceeding. Intercollegiate Br. 31 (citing 2014 Final Determination, 79 Fed. Reg. at 23,121 n.56). But that colloquy was in the written record, and nothing about the Appointments Clause barred the Board from relying on it -- any more than it would bar it from relying on a colloquy between two counsel, neither of whom was appointed by anyone. In any event, the colloquy in question was on a topic not challenged on this appeal. *See* 79 Fed. Reg. at 23,121 n.56 (discussing the adoption of the voluntary settlement for noncommercial *educational* webcasters).

Finally, Intercollegiate complains that the new Board was not independent because its failure to conduct live hearings deprived the Board of the ability to make its own assessments of witness credibility based on demeanor. To the extent this complaint implies that the Board relied on the prior Board's assessments of witness demeanor, that is unsupported. We do not see any instances in which the new or the prior Board made credibility determinations based on demeanor, and Intercollegiate's briefs do not describe any such instances. And to the extent this is a claim that the Board was required to hear oral testimony rather than rely on hearsay or a paper record, that is at most a statutory claim, which we address below. *See infra* Part III. As we said above, there is nothing in the Appointments Clause that requires live hearings.

3. In sum, we find nothing in the proceedings leading up to and including the new Board's determination that suggests a

lack of independence from the previous, constitutionally defective determination.[5]

## C

Intercollegiate maintains that even asking for evidence of ongoing taint from the previous proceeding amounts to improperly applying a harmless-error test. Because an Appointments Clause violation is a structural error that warrants reversal regardless of whether prejudice can be shown, *see Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000) ("There is certainly no rule that a party claiming constitutional error in the vesting authority must show a direct causal link between the error and the authority's adverse decision."), Intercollegiate maintains that it is not required to show any taint. But Intercollegiate's invocation of this principle is misplaced. In our prior decision in this matter, we concluded that the appointment of the Judges constituted error under the Appointments Clause, and (consistent with *Landry*) we vacated their decision without any consideration of whether that error was harmless. *Intercollegiate II*, 684 F.3d at 1342. The Librarian responded by appointing new Judges. As all acknowledge, there was no Appointments Clause error in those subsequent appointments. Accordingly, we are not now considering taint in order to determine whether an error was harmless. Rather, we are

---

[5]Although we have focused on Intercollegiate's many criticisms of the scope of the review undertaken by the new Board, we do not mean to suggest that a review of similar scope (which was, in fact, quite expansive) was required to ensure the absence of an Appointments Clause problem on remand. Indeed, in *Legi-Tech* we rejected the appellee's claim that the FEC "must redo the statutorily required procedures in their entirety" to cure the constitutional defect in the previously constituted Commission. 75 F.3d at 707; *see id.* at 708-09.

considering taint to determine whether there was any error in the second proceeding at all.

*Landry*, repeatedly cited by Intercollegiate, only reinforces the point. The case involved an Appointments Clause challenge to the Administrative Law Judge (ALJ) who presided over the petitioner's disciplinary hearing. 204 F.3d at 1130. That challenge, we held, was not precluded simply because the properly appointed members of the agency had affirmed the ALJ's decision upon direct, de novo review. *Id.* at 1130-31. An important basis for our decision was the "catch-22" the case posed: "If the process of final de novo review could cleanse the [Appointments Clause] violation of its harmful impact, then all such arrangements would escape judicial review." *Id.* Here, however, the unconstitutional arrangement did not escape judicial review. In our previous decision, we found an Appointments Clause violation, and then remedied it by both invalidating the offending statutory provision and vacating the prior determination -- all without requiring any showing of prejudice.

Indeed, for all its protest, the overall gravamen of Intercollegiate's challenge is that "the Judges' Determination is still *tainted* by the Appointments Clause violation that originally led this Court to remand" the previous determination. Intercollegiate Br. 15 (emphasis added); *see* Reply Br. 4. It thus implicitly acknowledges that, in the absence of taint, it would have no claim. Intercollegiate also acknowledges that not every possible kind of taint is fatal because, if it were, there would be no way to remedy an Appointments Clause violation. It is always possible, for example, that a subsequent judge will affirm a former judge's decision simply out of agency solidarity. But even Intercollegiate acknowledges that this kind of speculative taint would be insufficient to render the second judge's decision invalid. *See* Oral Arg. Recording at 40:04-

42:32.[6] As we said above, a court's holding that there has been an Appointments Clause violation does not mean that the violation cannot be remedied by a new, proper appointment. And once there has been such an appointment, the subsequent proceeding is constitutionally suspect only if there is sufficient continuing taint arising from the first. *See Legi-Tech*, 75 F.3d at 708 n.5 ("[T]he issue is not whether Legi-Tech was prejudiced by the original [decision], which it undoubtedly was, but whether, given the FEC's remedial actions, there is sufficient remaining prejudice to warrant dismissal.").

In sum, because the Judges' determination was an independent, de novo decision by a properly appointed panel seized with the full authority of the prior Board, we reject Intercollegiate's challenge to its constitutionality.

III

In its reply brief, Intercollegiate argues that the Board's determination was also improper because it failed to give effect to this court's vacatur of the previous determination. Nothing in our prior decision addressed what the Board had to do on remand. Nonetheless, Intercollegiate argues that, under our precedent, "when an agency determination is *vacated* and remanded, the remedy includes compiling a new record." Reply Br. 2. As we discuss below, that is not the law unless a statute so requires. In this case, no statute does.

---

[6]*See Legi-Tech*, 75 F.3d at 708 (affirming decision of a reconstituted FEC, notwithstanding that the court was "willing to assume that no matter what course was followed -- other than a dismissal with prejudice (which not even Legi-Tech dares request) -- some effects of the unconstitutional structure of the FEC are to be presumed to have impacted on the action").

The precedent upon which Intercollegiate relies is *Action on Smoking & Health v. Civil Aeronautics Board*, 713 F.2d 795 (D.C. Cir. 1983). There, an agency had re-promulgated a previously vacated rule without reopening the rulemaking for additional notice and comment. We admonished the agency that the word "vacate" means, among other things, "to cancel or rescind" and "to make of no authority or validity." *Id.* at 797. And we required the agency to initiate new rulemaking proceedings before re-promulgating the vacated rule. *Id.* at 798.

Intercollegiate reads too much into *Action on Smoking*. In that case, we required the agency to begin new notice-and-comment proceedings because the relevant statute, the Administrative Procedure Act (APA), required them for a new rulemaking. *See id.* at 798, 800 (citing 5 U.S.C. § 553(b), (c)). But we also noted that for some agency decisions, neither the agency's organic act nor the APA requires hearings -- either initially or on a remand.[7] Moreover, we made clear that, even where the APA ordinarily does require notice-and-comment proceedings, we were "not hold[ing] that an agency must start from scratch in *every* situation in which rules are vacated or remanded." *Id.* at 800. Rather, "[a]n exception is provided by the Administrative Procedure Act itself 'when the agency for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.'" *Id.* (quoting 5 U.S.C.

---

[7]*See Action on Smoking*, 713 F.2d at 799 n.2 (noting that, because "'neither the National Bank Act nor the APA requires the Comptroller to hold a hearing . . . when passing on applications for new banking authorities,' . . . the court of appeals . . . would not have been authorized to require the Comptroller to conduct new hearings" on remand (quoting *Camp v. Pitts*, 411 U.S. 138, 140-41 (1973))).

§ 553(b)(B)).[8] That exception did not apply in *Action on Smoking*, partly because the new rule "contain[ed] not a single word" explaining why the new proceedings would have been "impracticable, unnecessary, or contrary to the public interest." *Id.*

In this case, as Intercollegiate acknowledges, the Board is not governed by the notice-and-comment rulemaking requirements of the APA, but rather by the procedures set forth in the Copyright Act. *See* Reply Br. 8 n.7. Consequently, at most our vacatur required the Board to conduct a remand proceeding that complied with those procedures, which it did.

First, neither the Copyright Act nor the Board's regulations prescribe any particular procedures on remand. *See* 17 U.S.C. § 803(a), (d)(3). The relevant regulation provides only that, "[i]n the event of a remand . . . , the parties to the proceeding shall . . . file with the Judges written proposals for the conduct and schedule of the resolution of the remand." 37 C.F.R. § 351.15. At the time of its adoption, the Board described that regulation as "purposely flexible to permit the Judges, and the parties, to address the particulars of each remand before the Judges in an effort to promote administrative efficiency and reduce costs." *See* Proceedings of the Copyright Royalty Board; Remand, 74 Fed. Reg. 38,532, 38,532 (Aug. 4, 2009). A de novo review of the record falls well within that description.

Second, even assuming that the entirety of the procedural requirements for initial determinations applied, a record review would still pass muster. The statute gives the Board two ways

---

[8]As we subsequently explained, "[i]f the original record is still fresh, a new round of notice and comment might be unnecessary" within the meaning of that exception. *Mobil Oil Corp. v. EPA*, 35 F.3d 579, 584-85 (D.C. Cir. 1994).

to evaluate the parties' evidence and establish appropriate rates. The Board may conduct a live, trial-like adversarial hearing, thereby permitting the cross-examination of witnesses and the introduction of trial exhibits. *See* 17 U.S.C. § 803(b) (describing such hearings); 37 C.F.R. §§ 351.3, 351.5-.10. Or, the Board may "decide, sua sponte or upon motion of a participant, to determine issues on the basis of" the parties' submissions through "[p]aper proceedings." 17 U.S.C. § 803(b)(5). The Board must take the latter approach when the material facts are undisputed and all parties consent, but it may also conduct a paper proceeding "under such other circumstances *as the Copyright Royalty Judges consider appropriate*." *Id.* (emphasis added). Here, after receiving proposals from the parties, the Judges determined that "it would be neither fair, nor efficient, nor economical to proceed . . . with additional submissions, discovery, and evidentiary hearings." Notice at 7-8 (J.A. 224-25). Accordingly, as permitted by 17 U.S.C. § 803(b)(5), they stated their intention to "conduct[] only a paper proceeding, consisting of a review of the existing record in this proceeding." Notice at 9 (J.A. 226).

That determination was reasonable. As the Board explained, "[e]ach party . . . had ample opportunity to present its case" in the initial proceedings, and "no party has provided any specific reason why it is necessary to reopen the record and take further evidence." *Id.* at 7 (J.A. 224). Moreover, Intercollegiate had "fail[ed] . . . to point to any instance of an exclusion of relevant evidence that affected the outcome of the proceeding, or to any portion of the Final Determination that turned on witness credibility." *Id.* Nor did Intercollegiate fill those gaps during the subsequent comment period. *See* IBS's Comments Regarding Judges' Notice of Intention to Conduct Paper Hearings 1-4 (J.A. 227-30).

Intercollegiate further maintains that the Board violated the statute by conducting a papers-only proceeding that in fact went beyond the usual papers by including transcripts of oral testimony taken by the earlier Board. The papers-only proceeding described in the statute consists of "written direct statement[s] . . . , the response by any opposing participant, and one additional response by each such participant." 17 U.S.C. § 803(b)(5). To the extent Intercollegiate argues that the statute does not contemplate consideration of a transcript of previous oral testimony in a paper proceeding, its position is contrary to the text of both the statute and the relevant regulation. *See id.* § 803(b)(6)(C)(ii)(II) (broadly defining "written direct statement" as "witness statements, testimony, and exhibits to be presented in the proceedings, and such other information that is necessary to establish terms and rates, or the distribution of royalty payments, as the case may be, as set forth in regulations issued by the Copyright Royalty Judges"); 37 C.F.R. § 351.4(b)(2) (providing that a party relying on "the testimony of a witness in a prior proceeding . . . shall include a copy with the written direct statement").[9] But even if Intercollegiate were correct that the statute does not specifically provide for the consideration of such a transcript in a paper proceeding, there is no basis for concluding that a proceeding that *exceeds* the statutory requirements is improper -- or at least not sufficiently improper to require another vacatur, particularly in light of the

---

[9]The Board's regulations also provide that procedural requirements "may be suspended or waived, in whole or in part, upon a showing of good cause, to the extent allowable by law." 37 C.F.R. § 350.6. The Board's Notice of Intention to Conduct a Paper Proceeding provided a persuasive showing of good cause for relying on an enhanced papers-only record.

APA's admonition to take "due account . . . of the rule of prejudicial error," 5 U.S.C. § 706.[10]

In sum, because neither this court's vacatur order nor any statute bars the procedural approach the Board took on remand, we reject Intercollegiate's claim that the Board's approach contravened our order.

IV

Intercollegiate also challenges the merits of the Board's imposition of a $500 annual minimum fee for all noncommercial webcasters, including "small" and "very small" webcasters. We consider such a challenge under the judicial review standards of the APA. *See* 17 U.S.C. § 803(d)(3) (providing that "Section 706 of title 5 shall apply with respect to review by the court of appeals under this subsection"). Under those standards, we will uphold a ratemaking determination unless it is "arbitrary, capricious, contrary to law, or not supported by substantial evidence." *Intercollegiate I*, 574 F.3d at 755 (citing 5 U.S.C. § 706(2)). "Review of administratively determined rates is particularly deferential because of their highly technical nature." *Id*. (internal quotation marks omitted).

---

[10]Intercollegiate also argues that relying on a paper proceeding gives "short shrift" to the Supreme Court's teaching "in *Wingo* . . . [about] just how important the judge's role of factfinder is." Intercollegiate Br. 29-30. But as we have explained above, *see supra* Part II.A.2, *Wingo*'s holding was based on a statute that required the judge to personally hold evidentiary hearings. *See* 418 U.S. at 472-74. By contrast, not only does the statute at issue here permit the Judges to hold paper proceedings, 17 U.S.C. § 803(b)(5), it also permits them to consider hearsay in any kind of proceeding, *id.* § 803(b)(6)(C)(iii).

Intercollegiate argues that the $500 minimum fee was arbitrary, capricious, and contrary to law because the Judges: (A) failed to consider the statutorily prescribed factors; and (B) ignored the record evidence.

A

Intercollegiate contends that the Board failed to honor the statutory requirement that, in setting reasonable royalty rates, it "distinguish among the different types of eligible nonsubscription transmission services then in operation" and determine "a minimum fee for each such *type of service*." 17 U.S.C. § 114(f)(2)(B) (emphasis added). The appellant argues that, by setting the same annual minimum fee for all commercial and noncommercial webcasters regardless of their size, the Board did not distinguish between "types" of entities but instead treated them the same.

In fact, the Board did acknowledge the statutory requirement that it distinguish among different types of webcasters. *See* 2014 Final Determination, 79 Fed. Reg. at 23,122. And it did distinguish between two types -- that is, between commercial and noncommercial webcasting services -- "because there is a good economic foundation for maintaining this dichotomy." *Id.* Although it imposed the same annual minimum fee on both, *see* 37 C.F.R. § 380.3(b)(1)-(2), it set per-performance royalty rates and payment terms for commercial services that are different from those for noncommercial services, *see id.*; 79 Fed. Reg. at 23,121-23.[11]  Moreover, the reason the Board set the minimum fee for commercial services at $500 was that it was statutorily required to do so:  $500 was

---

[11]This is not to suggest, however, that the requirement to distinguish among different types of services obligates the Board to impose different fees when the same fee would be reasonable.

the fee upon which commercial webcasters had agreed in a voluntary settlement, *see* 79 Fed. Reg. at 23,104, and the statute requires the Board to give effect to such voluntary agreements "in lieu of" any determination, *see* 17 U.S.C. § 114(f)(3). That did not disable the Board from fixing $500 as the fee for noncommercial webcasters if such a fee was in accord with the statutory criteria.

What the Board declined to do was adopt Intercollegiate's "proposal to make further distinctions among noncommercial webcasters based on the quantity of sound recordings they transmit under the statutory license (as measured by ATH [Aggregate Tuning Hours])." 2014 Final Determination, 79 Fed. Reg. at 23,122. Intercollegiate's proposal was to create two new categories of noncommercial webcasters: "small" noncommercial webcasters (defined as noncommercial webcasters with usage up to 15,914 ATH per month) and "very small" noncommercial webcasters (defined as noncommercial webcasters with usage up to 6,365 ATH per month). *Id.* at 23,121. Under Intercollegiate's proposal, small noncommercial webcasters would pay a flat annual fee of $50. *Id.* Very small noncommercial webcasters would pay a flat annual fee of $20. *Id.*

The statute does direct that, in distinguishing among different types of services, "such differences [are] to be based on criteria including, but not limited to, the quantity and nature of the use of sound recordings." 17 U.S.C. § 114(f)(2)(B). But it also directs that, "[i]n establishing rates and terms for transmissions" by such services, the Board "shall establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id.* And the Board concluded that the evidence did not support the proposition that "a willing buyer and a willing seller would negotiate a different

rate for noncommercial webcasters at a given ATH level than they would for all other noncommercial webcasters." 2014 Final Determination, 79 Fed. Reg. at 23,122.

Intercollegiate maintains that, far from relying on the willing-buyer/willing-seller factor, the Board effectively disregarded it. According to Intercollegiate, Congress "required the [Judges] to set a rate that webcasters would willingly agree to in the marketplace, and there is no substantial evidence that any webcaster, regardless of its financial means, would agree to a $500 annual fee." Intercollegiate Br. 38-39 (emphasis omitted). Indeed, Intercollegiate insists that "the very fact that it objected to the universal $500 fee is evidence that some webcasters would not" agree to that fee. *Id.* at 39.

This misstates the statutory directive in two ways. First, the Act requires the Board to impose a "minimum fee for each such *type* of service," 17 U.S.C. § 114(f)(2)(B) (emphasis added), not for each individual webcaster. And second, the Board must set a fee that both a willing buyer *and* a willing seller would negotiate, not just one that is acceptable to the buyer (the webcaster). *See* 2014 Final Determination, 79 Fed. Reg. at 23,123. The Act does not permit Intercollegiate to veto a fee simply by objecting.

As we discuss below, the Board did in fact base its decision on the willing-buyer/willing-seller factor. And it had substantial evidence to support its conclusion that the $500 minimum fee was appropriate.

B

In the proceedings below, Intercollegiate's primary argument in support of its proposal was that small and very small noncommercial webcasters are unable to pay the $500

minimum fee and hence would not willingly agree to it. As the Board noted, however, there was no record evidence to support that argument. *See* 2014 Final Determination, 79 Fed. Reg. at 23,123. Intercollegiate did not offer testimony from any member claiming to be adversely affected by the $500 fee, "in spite of the Judges' invitation to do so." *Id.* at 23,121. Nor did it "offer testimony from any entity that demonstrably qualified as a 'small' or 'very small' noncommercial webcaster." *Id.* at 23,123. Indeed, the Board noted that Intercollegiate's assertion was "undercut by testimony that some of these same entities pay IBS close to $500 annually for membership dues and fees for attending conferences." *Id.*

The only evidence that Intercollegiate points to now, or that it relied on before the Board, is "a reference by Captain Kass [its chief operating officer] to a survey that showed that IBS members had an average annual operating budget of $9,000." 79 Fed. Reg. at 23,123; *see* Intercollegiate Br. 37. Intercollegiate complains that "[t]he Judges improperly chose not to credit this testimony -- not because it was not probative or persuasive, but because they [improperly] considered it inadmissible." Intercollegiate Br. 37. But that is wrong on two counts. First, the Board properly excluded Kass' reference to the survey because Intercollegiate did not offer the survey itself into evidence, and without that evidence, the Board could not assess its validity. *See* 79 Fed. Reg. at 23,123 (citing 37 C.F.R. § 351.10(e)). Second, the Board reasonably concluded that, even if it "could accept such a reference as evidence, it would not advance IBS' case [because] an assertion that the average operating budget for IBS members is $9,000 does not establish that its members lack the wherewithal to pay a $500 minimum royalty." *Id.* Moreover, the Board reasonably noted that there was no necessary "correlation between the quantity of sound recordings being transmitted by a noncommercial webcaster," which was the criterion for Intercollegiate's designation of small

and very small services, "and the size of that webcaster's operating budget (and, thus, its ability to pay a $500 minimum annual fee)." *Id.*[12]

By contrast, the Board found affirmative evidence that noncommercial webcasters were indeed both "able and willing to pay the proposed fees." 79 Fed. Reg. at 23,123. The most persuasive such evidence -- as well as support for a $500 minimum fee as the amount that willing buyers and sellers would negotiate -- was that College Broadcasters, an organization representing noncommercial educational broadcasters, had already reached a voluntary agreement with SoundExchange (the nonprofit entity that collects statutory royalties and distributes them to the copyright holders) that included the same fee. *Id.* The statute expressly authorizes the

---

[12]In a footnote, Intercollegiate also refers to Kass' testimony that some Intercollegiate members have annual operating budgets as low as $250 or less. Intercollegiate 39 n.70. The Board concluded that this evidence was of little import because:

> Captain Kass did not testify that any of those IBS members would fall into either of IBS's proposed categories of "small" and "very small" noncommercial webcasters (which are defined based on their ATH usage, not on the size of their operating budgets). Nor did IBS present any evidence as to how many IBS members had similarly small operating budgets. Nor did IBS disclose the basis for this statement.

Order Denying Mot. for Reh'g 4 (J.A. 237). The Board was not unreasonable in concluding that this "single anecdotal reference to 'some' webcasters with miniscule operating budgets [was] insufficient to demonstrate the existence of a distinct segment of the noninteractive webcasting market." *Id.* (internal quotation marks omitted).

Board to consider the rates and terms of such voluntary license agreements in setting webcasting rates and terms. 17 U.S.C. § 114(f)(2)(B).

The Board also found corroboration in the fact that "24 noncommercial webcasters filed comments with the Judges stating that they support[ed] the rates and terms of [that] Agreement, which they found reasonable and affordable." 79 Fed. Reg. at 23,121; *see id.* at 23,123. And there was also the fact that, in the ratemaking for the 2006-2010 period, "it was established . . . that 363 noncommercial webcasters paid royalties in 2009 similar to SoundExchange's current rate proposal, with 305 of those webcasters paying only the $500 minimum fee." *Id.* at 23,123. "Taken together with IBS's failure to present even a morsel of contrary evidence, the Judges [found] this fact to be strong evidence that noncommercial webcasters are able and willing to pay the proposed fees." *Id.*

Finally, the Board also relied on testimony from SoundExchange's chief operating officer, who testified that its average annual administrative cost per station or channel was approximately $825. 79 Fed. Reg. at 23,124. Intercollegiate "offered no persuasive evidence to dispute this estimate." *Id.* Noting Board precedents concluding that it was reasonable and appropriate for the minimum fee to cover SoundExchange's administrative cost, the Judges found that, "[w]ith the average administrative cost exceeding $800, . . . a $500 minimum fee [was] eminently reasonable and appropriate." *Id.*; *see Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 949 (D.C. Cir. 2005) (concluding that the Librarian was not arbitrary in approving a $500 minimum fee "to cover the license administrator's administrative costs" because the administrator "would not have negotiated a minimum fee that failed to cover at least its administrative costs"). In the Board's view, SoundExchange's costs further supported its finding that

Intercollegiate's proposal of a $20 or $50 fee did not satisfy the willing-buyer/willing-seller standard. "The record does not support a conclusion," the Board reasonably concluded, that "a willing seller would agree to a price that is substantially below its administrative costs." 79 Fed. Reg. at 23,123.

Intercollegiate claims that, in relying on the absence of evidence to dispute SoundExchange's evidence of average cost, the Board made the same mistake it made in the rate proceeding for 2006-2010, when it also set a $500 minimum fee on "the theory that [it] covered the costs of administering the statutory license." Intercollegiate Br. 38 (citing *Intercollegiate I*, 574 F.3d at 767). In *Intercollegiate I*, this court vacated that fee because the Board's conclusion about SoundExchange's administrative costs was based largely on the fact that SoundExchange had proposed the fee, coupled with a "lack of evidence" that the fee did not reflect the organization's costs. 574 F.3d at 767. "[R]ational decisionmaking," we said, "requires more than an absence of contrary evidence; it requires substantial evidence to support a decision." *Id.* Accordingly, we found it arbitrary for the Board to impose the $500 fee on the theory that webcasters should pay the administrative cost of administering the license when there was no record evidence of what that cost was. *Id.*

This time, however, the Board did not set the fee based solely on SoundExchange's administrative costs. It also relied on the above-described evidence of what a willing buyer and seller would negotiate. And this time, the Board did not reach a conclusion about SoundExchange's administrative costs in the absence of record evidence. Instead, it relied on the evidence of industry-wide average administrative cost.

Evidence of average cost may not be perfect, but nothing in *Intercollegiate I* bars its use. It is true, as Intercollegiate notes,

that there was evidence that "[t]he exact cost imposed by any particular licensee varies widely." Reply Br. 18 (quoting Kessler Test. at 25 (J.A. 26)). But that is often the case with average cost. And as we discussed above, and made clear in *Intercollegiate I* itself, the statute does not require the Board to set royalty fees licensee by licensee.[13] To the contrary, the statute instructs the Board to impose a "minimum fee for each such *type* of service." 17 U.S.C. § 114(f)(2)(B) (emphasis added); *see Beethoven.com*, 394 F.3d at 949.

As we have noted, the Copyright Act directs the Board to "establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller" if the webcasting statutory license did not exist. 17 U.S.C. § 114(f)(2)(B). But "[t]he statute does not require that the [hypothetical] market assumed by the Judges achieve metaphysical perfection." *Intercollegiate I*, 574 F.3d at 757. This court's task is "only [to] assess the reasonableness of the Judges' interpretation of the inherent ambiguity" in Congress' directive. *Id.* In light of the evidence of SoundExchange's average administrative cost, the voluntary agreement between College Broadcasters and SoundExchange setting a $500 minimum fee, the comments of other noncommercial webcasters supporting that fee, and the experience of the 2006-2010 ratemaking, the Board had substantial evidence to support its conclusion that an annual

---

[13]*See Intercollegiate I*, 574 F.3d at 761 ("The Judges are not required to preserve the business of every participant in a market. They are required to set rates and terms that 'most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller.' If small commercial webcasters cannot pay the same rate as other willing buyers and still earn a profit, then the Judges are not required to accommodate them." (quoting 17 U.S.C. § 114(f)(2)(B))).

minimum fee of $500 reasonably approximated that to which a willing buyer and seller would agree.  Accordingly, it did not act unreasonably in setting that fee.

V

For the foregoing reasons, we affirm the determination of the Copyright Royalty Board.

*So ordered.*